IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN COLIN COLLETTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-2912 |
| | ) | |
| THE ARCHDIOCESE OF CHICAGO, | ) | Judge Charles P. Kocoras |
| And | ) | |
| HOLY FAMILY CATHOLIC PARISH, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS**
**PURSUANT TO FEDERAL RULE 12(b)(6)**

Now comes the Plaintiff, JOHN COLIN COLLETTE, by and through his attorneys, LAVELLE LAW LTD., and for his response to Defendants' MOTION TO DISMISS pursuant to Fed.R.Civ.P 12(b)(6), states as follows:

**STANDARD OF REVIEW**

When a party seeks to dismiss a Complaint pursuant to Fed.R.Civ.P 12(b)(6), the Court must "take the plaintiff's factual allegations as true and draw all reasonable inferences in his favor." *Brown v. Budz*, 398 F.3d 904, 907 (7th Cir. 2005), citing *DeWalt v. Carter*, 224 F.3d 607, 612 (7th Cir. 2000) and *Strasburger v. Bd. of Educ.*, 143 F.3d 351, 359 (7th Cir. 1998). Furthermore, a "complaint should be dismissed for failure to state a claim only if no relief could be granted under any set of facts that could be proved consistent with the allegations." *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005). Indeed, "if it is possible to hypothesize a set of facts, consistent with the complaint, that would entitle the plaintiff to relief, dismissal under Rule 12(b)(6) is inappropriate." *Brown*, 398 F.3d at 907, citing *Sanville v. McCaughtry*, 266 F.3d 724,

1

732 (7th Cir. 2001) and *Veazey v. Communications & Cable of Chicago, Inc.*, 194 F.3d 850, 854 (7th Cir. 1999).

**ARGUMENT**

Mr. Collette brings his suit against Holy Family and the Archdiocese alleging that he was terminated from his 17-year-employment at the church, in which he was, from the very start, known as an "out" gay man, strictly because he planned to marry a man, rather than a woman, a union the Church called "non-sacramental." He also alleges that he was an employee of the church, that he made no decisions for the choice of music or liturgy in his employment roles, and that others similarly situated, in non-sacramental relationships, were able to engage in similar opposite-sex marriages or maintain non-sacramental relationships while keeping their jobs.

For their part, Defendants do not even deny these claims. While the case amounts to *prime facie* discrimination, Defendants improperly attempt to use the ministerial exception – an affirmative defense – to entirely bar the action. Such an argument not only fails to acknowledge that Defendants have improperly attempted to use factual issues to dispose of a matter as an issue of law, but also fails to apply the proper test from which the ministerial exception is derived.

Defendants claim that Mr. Collette is a minister by virtue of his title alone, and therefore his suit for wrongful termination must be dismissed as a matter of law pursuant to the ruling in *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 n.4, 132 S. Ct. 694, 709 (2012). However, the very case cited by Defendants establishes three important matters, entirely ignored by Defendants: first, that the ministerial exception is an affirmative defense and not a jurisdictional bar; two, that there is a four-part facts-based standard for determining if an employee is a "minister" for a church; and three, that not all employees qualify as ministers.

There also exists a larger argument – also conveniently ignored by Defendants – that the issue in dispute here is part of a larger and broader movement within the constitutional law of the United States of America. That is that the right of a person to engage in a same-sex marriage has been established as a fundamental right protected under the Constitution of the United States of America. For each of Defendants' claims that Mr. Collette – an unemployed gay man – somehow is depriving constitutional rights of the massive and well-capitalized Catholic Church, there is a counterargument that the Catholic Church has deprived Mr. Collette of his constitutional fundamental right to marry. It cannot be ignored that the landscape is changing for gay rights in the United States. While the Catholic Church may be buoyed by its historical success in discriminating under the protections afforded it by the rubric of the free exercise clause and the ministerial exception, those protections are not absolute nor indelible. Try as it might to claim otherwise, the Catholic Church does not exist in a constitutional law vacuum. The State of Illinois and the Supreme Court of the United States have afforded Mr. Collette the right to marry a man, and, absent weighing the facts of the instant case against *Hosanna-Tabor*, it remains to be seen whether the church's rights under the establishment clause are paramount to Mr. Collette's right to marry his partner. Such a ruling is ripe for the Court's determination.

### I. The Ministerial Exception is an Affirmative Defense, not a Jurisdictional Bar.

For all their bluster, Defendants attempt to dispose of Mr. Collette's Complaint via a Motion to Dismiss pursuant to Fed.R.Civ.P 12(b)(6), citing *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1043 (7th Cir. 2006). Defendants' Motion to Dismiss 2. Defendants cite the case saying that it was "reversed on other grounds." *Id*. However, the case was not reversed on other grounds. It was, in fact, reversed for the precise proposition that Defendants cite it – that the

Seventh Circuit affirmed the dismissal of a music director on a Motion to Dismiss the claim, prior to any fact-based inquiry. *Hosanna-Tabor*, 565 U.S. 171 n.4, 132 S. Ct. 694, 709 (2012).

The U.S. Supreme Court in *Hosanna-Tabor* – a case cited by Defendants – clearly and explicitly abrogated the *Tomic* ruling, stating in Footnote 4 of the Court's majority opinion:

> *"A conflict has arisen in the Courts of Appeals over whether the ministerial exception is a jurisdictional bar or a defense on the merits. Compare Hollins, 474 F. 3d, at 225 (treating the exception as jurisdictional); and Tomic v. Catholic Diocese of Peoria, 442 F.3d 1036, 1038-1039 (CA7 2006) (same), with Petruska, 462 F. 3d, at 302 (treating the exception as an affirmative defense); Bryce, 289 F. 3d, at 654 (same); Bollard v. California Province of Soc. of Jesus, 196 F.3d 940, 951 (CA9 1999) (same); and Natal, 878 F. 2d, at 1576 (same). We conclude that the exception operates as an affirmative defense to an otherwise cognizable claim, not a jurisdictional bar. That is because the issue presented by the exception is "whether the allegations the plaintiff makes entitle him to relief," not whether the court has "power to hear [the] case." Morrison v. National Australia Bank Ltd., 561 U.S. \_\_, 561 U.S. 247, 130 S. Ct. 2869, 177 L. Ed. 2d 535, 546 (2010) (internal quotation marks omitted). District courts have power to consider ADA claims in cases of this sort, and to decide whether the claim can proceed or is instead barred by the ministerial exception,"* <u>Hosanna-Tabor</u>, 565 U.S. 171 n.4, 132 S. Ct. 694, 709 (2012).

*Tomic* was not "reversed on other grounds." It was reversed on the precise proposition for which Defendants cite it – that the ministerial exception is an affirmative defense, not a jurisdictional bar making the issue ripe for dismissal via a motion to dismiss pursuant to Fed.R.Civ.P 12(b)(6). *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 n.4, 132 S. Ct. 694, 709 (2012).

Based on this ruling alone, the case law is clear that a director's role as a minister is a factual issue ripe for a fact-based inquiry. The Catholic Church may be entitled to assert the ministerial exception as an affirmative defense, but not as a total bar to sue when the Mr. Collette's Complaint clearly alleges that he did not have the sorts of responsibilities that are

4

afforded to the "ministers" contemplated under the ministerial exception. Defendants' motion also seeks to declare that Mr. Collette's position was "licensed." Motion to Dismiss 4. This allegation is beyond the scope of the Complaint and should accordingly be disregarded by the Court.

Defendants seek to have Mr. Collette's Complaint dismissed by accusing Mr. Collette of outright dishonesty, stating that his complaint is an "artiface," "chicanery," and "subterfuge," and that the document is "transparent." Motion to Dismiss 3, 5. However, a Motion pursuant to Fed.R.Civ.P 12(b)(6) does not provide leeway for the Court to consider the veracity of the facts pleaded by a Plaintiff. "Rule 12(b)(6) does not countenance dismissals based on a judge's disbelief of a complaint's factual allegations. The sole exception to this rule lies with allegations that are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel." *Ashcroft v. Iqbal*, 556 U.S. 662, 696, 129 S. Ct. 1937, 1959 (2009). The question of whether Mr. Collette is a minister is a factual inquiry that must be weighed by the Court.

Accordingly, given that all well-pleaded facts must be considered to be true under a Rule 12(b)(6) motion, Defendant's Motion must be denied.

## II. The Four-Prong Test Set Forth in *Hosanna-Tabor* is a Fact-Based Test.

*Hosanna-Tabor* sets forth that there are not one, but four factors that must be used to assess whether an employee falls within the ministerial exception. *Hosanna-Tabor*, 132 S. Ct. at 708 n.4 (2012). They are (1) the formal title given to the employee by the Church, (2) the substance reflected in that title, (3) his/her own use of that title, and (4) the important religious functions he/she performed at the church." *Id*.

In the present case, Defendants would have this Honorable Court declare Collette to be a "minister" by virtue of his title alone. However, that conclusory argument does not reflect the duty of the Court to weigh the other *Hosanna-Tabor* factors. Defendants never so much as mention how Mr. Collette used his title, the substance reflected in the title, and the functions he performed at the church. It is not enough to call someone a "minister" to bar them from litigating *prime facie* employment discrimination. The ministerial exception, while broad and deferential to religious institutions, does have limitations. Try as the Catholic Church might to make all employees – even school foodservice directors and teachers – into "ministers," *Hosanna-Tabor* does not stand for a blanket dispensation on a church's ability to ignore federal protections barring discrimination against the Lesbian, Gay, Bisexual and Transgender community. *Id.* See also *Barrett v. Fontbonne Academy*, 33 Mass. L. Rep. 287 (2015); *Dias v. Archdiocese of Cincinnati*, No. 1:11-CV-00251, 2012 U.S. Dist. LEXIS 43240, 9 (S.D. Ohio Mar. 29, 2012). This is particularly relevant given the new protections afforded these individuals in recent Court rulings, as set forth more fully below.

"Although the ministerial exception might imply an absolute exception, it is not always a complete barrier to suit; for example, a case may proceed if it involves a limited inquiry that "combined with the ability of the district court to control discovery, can prevent a wide-ranging intrusion into sensitive religious matters," *McCallum v. Billy Graham Evangelistic Association*, 824 F. Supp.2d 644 (W.D.N.C. 2011).

The factors listed herein are factual matters that cannot be asserted or refuted as a matter of law. While Defendants chide Mr. Collette for asserting facts relevant to show that he was not, in fact, a minister, Defendant takes the same liberty, asserting as a strictly legal argument that Mr. Collette was a minister and requesting the Court to dispose of the case as a matter of law

6

pursuant to Fed.R.Civ.P 12(b)(6), when the facts are not only in dispute, but must be construed in favor of the non-moving party.

The minister/not a minister factual dispute is never more clear than in Defendants' own Motion to Dismiss, wherein Defendants claim "those allegations and omission are both misleading and *factually inaccurate*, and with regard to Plaintiff's role as Director of Music, comically suggestive that such position would have no connection to music whatsoever." Motion to Dismiss 3.

To claim that there is no factual dispute because Mr. Collette's Complaint is "misleading and *factually inaccurate*" renders Defendants' arguments self-defeating. *Id.*. If Mr. Collette's claims are "misleading" and "factually inaccurate," Defendants must do more than merely assert it. They must prove it. This task cannot be accomplished in a motion filed pursuant to Fed.R.Civ.P.12(b)(6).

What's more, Defendants then argue that by pleading the facts of his case – wherein he was denied his right to legally marry while keeping his job – that Mr. Collette is attempting to deprive Defendants of their rights. Nothing could be further from the truth. Defendants have an obvious right to discriminate against their ministers. But a "director" is not necessarily a minister. Defendants never bother to even weigh the facts in this case against the *Hosanna-Tabor* test.

A mere title is not enough. *Hosanna-Tabor* makes that clear. There are three other factors in play, none of which Defendants can escape, even if they would prefer to ignore them. Accordingly, Defendants' Motion to Dismiss must be denied.

**III.     Not All Church Employees Qualify as Ministers**

As set forth in the ruling in *Hosanna-Tabor*, not all church employees qualify as ministers. "While a ministerial title is undoubtedly relevant in applying the First Amendment rule at issue, such a title is neither necessary nor sufficient," *Hosanna-Tabor*, 132 S. Ct. at 713. The *Hosanna-Tabor* ruling sets forth all the reasons that its plaintiff qualified as a minister under the elements of the opinion, specifically that the Plaintiff led students in prayer, taught religion, and other facets of her job. No facts akin to these have been established by Defendants in this cause. In a motion brought pursuant to Rule 12(b)(6), all well-pleaded facts are considered to be true. *Ashcroft v. Iqbal*, 556 U.S. 662, 696, 129 S. Ct. 1937, 1959 (2009). Defendants argue only that "there can be no other conclusion but that Plaintiff was a minister." Motion to Dismiss 3. However, in truth, many church employees have qualified to be non-ministers under existing case law. *Barrett v. Fontbonne Academy*, 33 Mass. L. Rep. 287 (2015); *Dias v. Archdiocese of Cincinnati*, No. 1:11-CV-00251, 2012 U.S. Dist. LEXIS 43240, 9 (S.D. Ohio Mar. 29, 2012); *Cline v. Catholic Diocese*, 206 F.3d 651, 669 (6th Cir. 1999).

Moreover, the facts show that Defendants have relied so heavily on the term "minister" to accomplish their designs of immunity from discrimination claims that they have completely diluted the meaning of the term "minister" at Holy Family Catholic Parish. In an interview with "Chicago Tonight" Archbishop Blase Cupich stated that he believes every employee, including those who work in financial or human resources roles, are "ministers" under the ministerial exception. Archbishop Cupich stated in this interview that the ministerial exception "has to do with, for instance, anyone who is in a public position that is serving people is in some way, doing some kind of ministry. We have lay-ecclesial ministers in the Archdiocese. People who are witnessing to the faith -- not only in providing a job, but witnessing to what we believe and what our ethos is. It would be very difficult to have someone who is in that position either an authority

or witness by their role in order to continue." Chicago Tonight, May 5, 2015, http://chicagotonight.wttw.com/2015/05/05/one-one-chicago-archbishop-blase-cupich.

This expansive view of the ministerial exception is not supported by *Hosanna-Tabor*, which provided only for those who perform important religious functions within the church and hold substantive titles pertaining to ministry at the church. *Hosanna-Tabor*, 132 S. Ct. at 708.

The facts of this case, should they ever so rightfully be weighed by the Court, show that Holy Family Catholic Parish considers dozens, if not hundreds of parishioners to be "ministers" of God's word. Ministers are as young as 17 years old. More than thirty (30) ministers are named in the "leadership structure" of Holy Family in the bulletin each Sunday, in addition to the priests and clergy who work at Holy Family. The church appoints "liturgical ministers" to oversee seventeen (17) different committees, including a sewing committee and a projection and sound committee. Church Bulletin, Holy Family Catholic Parish, http://3jcqr63b3wmu40dlko1tjp2yu9p.wpengine.netdna-cdn.com/wp-content/uploads/2013/01/July-3-2016-final.pdf.

In addition, Holy Family has ministers who are juniors and seniors in high school, sign language leaders, and wedding ministers. It names people "hospitality ministers" for providing snacks after Mass at the Church. The Church also has ten (10) Table & Light ministers and eighteen (18) Eucharistic ministers, twelve (12) of whom are teens, and Ministers of Care to the Sick. The Church advertises in its bulletin that parishioners can become members of the Church's "ministry" by cooking their favorite meals for Parish Pastor Fr. Terence Keehan or by volunteering in the Church gift shop. Church Bulletin, Holy Family Catholic Parish, http://3jcqr63b3wmu40dlko1tjp2yu9p.wpengine.netdna-cdn.com/wp-content/uploads/2013/01/July-3-2016-final.pdf.

To say that Mr. Collette may be terminated at Holy Family based on a discriminatory reason because he was a "minister" at Holy Family ignores the fact that literally dozens, if not hundreds, of people at Holy Family are considered to be ministers. Upon inspecting the Church's bulletins, Archbishop Cupich's definition of "minister" becomes clear: the Church characterizes anyone who has any role in the Church as a minister, including some not in wage-earning positions. Apparently, based on the Church's position in the instant case, the more ministers it has, the more good-hearted, faithful servants it has to discriminate against.

Such is not the case under the law, where Courts have applied the *Hosanna-Tabor* standard and found that a church employee was not a minister. *Barrett*, 33 Mass. L. Rep. at 287; *Dias*, No. 1:11-CV-00251, 2012 U.S. Dist. LEXIS 43240, 9 (S.D. Ohio Mar. 29, 2012). "It is not enough to generally call her a "role model," or find that she is a "minister" by virtue of her affiliation with a religious school. As such, Plaintiff's claims are not barred by the ministerial exception," *Id*.

In the present case, Mr. Collette did not hold any authority within the church, he merely carried out the decisions of the Church's pastor, Fr. Terence Keehan and the Church's Music Committee and Liturgy Committee. While it may be tempting to assume that the Defendant parish operates similarly to other Catholic parishes, such an assumption misses the factual basis of Mr. Collette's Complaint, which is that Holy Family's music and worship are selected by the parishioners. Such a fact, in itself, is the epitome of the reason why cases that turn on issues of fact cannot be disposed of on a Motion to Dismiss pursuant to Fed.R.Civ.P 12(b)(6). Without discovery, the facts in Collette's case cannot be weighed in the four-prong test under *Hosanna-Tabor*.

While the ministerial exception promotes the most cherished principles of religious liberty, its contours are not unlimited and its application in a given case requires a fact-specific inquiry. The ministerial exception does not insulate wholesale the religious employer from the operation of federal anti-discrimination statutes. *EEOC v. Roman Catholic Diocese*, 213 F.3d 795, 801 (4th Cir. 2000). For instance, the exception would not apply to employment decisions concerning purely custodial or administrative personnel. Rather, the exception shelters certain employment decisions from the scrutiny of civil authorities so as to preserve the independence of religious institutions in performing their spiritual functions. *EEOC v. Diocese*, 213 F.3d at 801.

There exists a "well-established refusal of the courts to distinguish between status and conduct in the sexual orientation discrimination context," *Barrett,* 33 Mass. L. Rep. at 287, citing, *Christian Legal Society*, 561 U.S.661, 689 (2010). See also *Lawrence v. Texas*, 539 U.S. 558, 583 (2003).

Like the plaintiff in *Barrett*, Mr. Collette has shown indisputably that he is a member of a protected class, that he was qualified for the position he held, that he suffered denial of employment, that the reason for the denial was his sex and sexual orientation, and that he suffered harm as a result. Again, like the plaintiff in *Barrett*, this proves sexual orientation discrimination as a matter of law on the undisputed facts. "There is no reason to employ burden-shifting analysis where there is direct evidence of discriminatory intent," *Barrett*, 33 Mass. L. Rep. at 287.

Mr. Collette's Complaint clearly states that he did not have the type of duties and obligations bestowed upon the *Hosanna-Tabor* plaintiff. If Defendants wish to allege otherwise, they must do so when the matter is at issue, not on a motion to dismiss. Accordingly, Defendants' motion must be denied.

### IV. The Fundamental Right to Marry Must be Weighed Against the Right to Terminate Lay Employees Under the Ministerial Exception.

While it is a primary tenet of our government that religious institutions should be free of governmental regulation in their operation, such a freedom must not drastically infringe on the other freedoms established by the Courts as fundamental to each person's life, liberty and pursuit of happiness. While the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof," (USCS Const. Amend. 1) Defendants fail to show any nexus whatsoever between Mr. Collette's continued employment and the interference of free exercise of religion.

Mr. Collette was, at the time of his termination, an employee of the church for 17 years. He was known to both parish employees and the congregation as a gay man. His then-partner (now his husband), Will Nifong, was also a fixture at parish events and services, attending functions for Church staff as Mr. Collette's companion and occasionally doing readings at Mass.

The only change to the status of Mr. Collette's employment took place upon Mr. Collette's engagement to marry Mr. Nifong in a civil marriage ceremony, which at the time was recently legalized in the state of Illinois. At no time prior to his termination did anyone raise any issues about Mr. Collette's relationship somehow interfering with the Church's ability to exercise its beliefs. In fact, the only right impinged by this action was Mr. Collette's right to marry, which was established in the landmark case of *Obergefell v. Hodges*, with the Court ruling: "Marriage is sacred to those who live by their religions and offers unique fulfillment to those who find meaning in the secular realm. Its dynamic allows two people to find a life that could not be found alone, for a marriage becomes greater than just the two persons. Rising from

the most basic human needs, marriage is essential to our most profound hopes and aspirations." *Obergefell v. Hodges*, 135 S. Ct. 2584, 2594 (2015).

While it is the Catholic Church's place to bestow upon people the sacrament of marriage, it is not the Church's place to deny others the right to civil marriage. The fact is, had he been employed by anyone other than a religious institution, Mr. Collette would be entitled to the fullest protection of the Civil Rights Act of 1964 against discrimination based on sex and sex stereotypes. The painful irony in Defendants' arguments is that by virtue of its place in our society as a moral leader, the Catholic Church seeks to discriminate in a way that our American principles otherwise find not only unlawful, but morally repugnant. Those who told us to love one another banished someone who was different. Those who espoused forgiveness gave no second chances. Those who taught us to turn the other cheek instead turned their backs.

Despite the Catholic Church's dogmatic beliefs, the American legal landscape has changed for gay, lesbian, bisexual and transgendered Americans. As recently as 1986, the Court upheld the constitutionality of a Georgia law that criminalized homosexual sex. *Bowers v. Hardwick*, 478 U.S. 186, 106 S. Ct. 2841, 92 L. Ed. 2d 140 (1986). But in 1996, the Court invalidated a Colorado constitutional amendment prohibiting protections against discrimination based on sexual orientation. *Romer v. Evans*, 517 U.S. 620, 116 S. Ct. 1620, 134 L. Ed. 2d 855 (1996). In 2003, the Court held that a Texas law criminalizing gay sex demeaned "the lives of homosexual persons" and held that "*Bowers* was not correct when it was decided." *Lawrence v. Texas*, 539 U.S. at 575. In 2015, the Court afforded gay and lesbian Americans the fundamental right to marry. *Obergefell v. Hodges*, 135 S. Ct. at 2596. These rulings recognized the historic discrimination suffered by gay and lesbian citizens, invalidating hundreds of laws aimed at

prohibiting gays and lesbians from engaging in everyday actions that heterosexual people have been afforded the unfettered right to engage in for years.

Courts continue to find that a person's sexuality is an inalienable characteristic of their very identities. "The leading scientific theories of the causes of homosexuality are genetic and neuroendocrine theories, the latter being theories that sexual orientation is shaped by a fetus's exposure to certain hormones." *Baskin v. Bogan*, 766 F.3d 648, 657 (7th Cir. 2014), citing J. Michael Bailey, "Biological Perspectives on Sexual Orientation," in Lesbian, Gay, and Bisexual Identities Over the Lifespan: Psychological Perspectives 102-30 (Anthony R. D'Augelli and Charlotte J. Patterson eds. 1995); Barbara L. Frankowski, "Sexual Orientation and Adolescents," 113 Pediatrics 1827, 1828 (2004).

Indeed, Pope Francis himself, the unquestioned leader of the Catholic Church, on June 26, 2016 proclaimed, in solidarity with gay rights celebrations across the world, that the Church owes the lesbian, gay, bisexual and transgender community an apology for the way it has marginalized and oppressed gay church members. Winfield, Nicole; The Associated Press "*Pope: Gays and Others Marginalized Deserve an Apology*," June 26, 2016. The vitriolic backlash to the Pope's comments by members of the Catholic Church was both unsurprising and sad. Forgiveness and understanding toward all people is at the core of Catholic beliefs, yet the Church does not use the ministerial exception as a shield to protect the itself from bad actors preaching and teaching false theology, but rather uses it as cudgel to blatantly discriminate against gay people.

And for what benefit? What religious necessity does the Catholic Church – or any church for that matter – derive from teaching its parishioners and congregants that, while they will only spiritually be judged by God, legally speaking, they will be judged and even terminated from

their employment for any non-conforming behavior that would otherwise be unlawful grounds for termination? How can the Church maintain that it sets forth a message of love and forgiveness, but claim that to fully establish its religion, it ***must*** be entitled to judge and discriminate? If discrimination is not the religion of the Catholic Church, then why is its survival contingent upon it preserving the legal, unparalleled right to discriminate? If the Church's teachings do not support discrimination, why must it be afforded the legal right to discriminate?

The ministerial exception does not – and should not – apply to Mr. Collette or those similarly situated. To be a lay-person employee of the Catholic Church should not mean that one gives up his Constitutional rights at the church door. While the Catholic Church will argue that the ministerial exception is fundamental to its First Amendment rights to establish and exercise a religion, it actually operates as a legal exemption from its own teachings to love and accept people as God made them.

Mr. Collette never suggested that the Church marry him. He never insisted the Church recognize his marriage. It was a civil ceremony – not a religious one – that led to his termination. "There is clear distinction between (1) compliance with non-discrimination mandate imposed by our civil laws even upon unwilling employers and (2) actual acceptance of same-sex marriage as a matter of religious doctrine or public policy," *Barrett*, 33 Mass. L. Rep. at 287.

The Court, in its *Obergefell* decision, weighed the rights of religious organizations to teach their religious principles to their followers and determined that civil same-sex marriage can no more be barred on religious grounds than the Church can be forced to offer religious same-sex marriage ceremonies, holding:

> *"[I]t must be emphasized that religions, and those who adhere to religious doctrines, may continue to advocate with utmost, sincere conviction that, by divine precepts, same-sex marriage should not be condoned. The First Amendment ensures that religious organizations and persons are given proper protection as they seek to teach the principles that are so fulfilling and so central to their lives and faiths, and to their own deep aspirations to continue the family structure they have long revered. The same is true of those who oppose same-sex marriage for other reasons. In turn, those who believe allowing same-sex marriage is proper or indeed essential, whether as a matter of religious conviction or secular belief, may engage those who disagree with their view in an open and searching debate. The Constitution, however, does not permit the State to bar same-sex couples from marriage on the same terms as accorded to couples of the opposite sex."* Obergefell v. Hodges, 135 S. Ct. 2584, 2607 (2015).

Mr. Collette engaged in a civil marriage ceremony. He never attempted to engage in the Catholic marriage sacrament. For the Catholic Church to impose its religious views on Mr. Collette just to allow him to maintain his employment is an infringement on his fundamental constitutional right to a same-sex marriage. It is nothing short of absurd for the Catholic Church to claim Mr. Collette is infringing on its rights.

To allow the Catholic Church to operate in a vacuum devoid of Constitutional rights is not to afford it freedom to establish a religion. It is to afford it freedom to operate in a different century – a world where separate is still equal, where reproductive choices are not afforded a right of privacy, where states can ban "sodomy" as a "preference."

There is nothing fundamental to its teachings that requires the Catholic Church to possess the legal right to discriminate against lay employees. Accordingly, Defendants' motion must be denied.

**CONCLUSION**

Simply put, the matter of whether Mr. Collette is a minister is an issue of fact that, in these circumstances, must not be disposed of as a matter of law. Mr. Collette's role in the church

is a factual matter. All inferences drawn from Mr. Collette's Complaint must be construed in Mr. Collette's favor. To allege that as a "director" that Mr. Collette was a minister is a conclusory leap that is nothing shy of the "misleading" and "transparent" transgressions of which Defendants accuse Mr. Collette. Lastly, there exists no religious purpose for the Catholic Church to be afforded an unparalleled and unfettered right to discriminate against lay employees. Accordingly, the Court must deny Defendants' Motion to Dismiss, or, in the alternative, grant Mr. Collette leave to file an amended complaint.

Respectfully submitted,

JOHN COLIN COLLETTE

/s/ Kristina B. Regal_____
By: One of his attorneys

Kerry M. Lavelle (Ill. Bar # 6201522)
Matthew J. Sheahin (Ill. Bar # 6243872)
Kristina B. Regal (Ill. Bar # 6300647)
LAVELLE LAW, LTD.
501 W. Colfax
Palatine, Illinois  60067
(847)705-7555
kmlavelle@lavellelaw.com
msheahin@lavellelaw.com
kregal@lavellelaw.com