IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COLIN COLLETTE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 16-cv-2912 |
| ) | Judge Charles Kocoras |
| HOLY FAMILY PARISH, THE ) | |
| ARCHDIOCESE OF CHICAGO, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT AS TO
<u>MINISTERIAL EXCEPTION AFFIRMATIVE DEFENSE</u>**

Defendants Holy Family Parish ("Parish") and the Archdiocese of Chicago ("Archdiocese"), by and through their attorneys, for their memorandum of law in support of motion for summary judgment on ministerial exception defense state as follows:

## **INTRODUCTION**

Plaintiff was the Parish's Director of Worship and Director of Music. In those dual roles, he was the central non-ordained member of the Parish's ministerial staff. He was held out by the Parish, and he held himself out, as a minister, and he conveyed the Parish's message through music and liturgy, including interpreting and teaching scripture. Because his positions were indisputably ministerial, his asserted discrimination claims are barred by the ministerial exception doctrine which prohibits the government from interfering with the decision of a religious organization to terminate one of its ministers. There simply can be no legitimate dispute on this point. In fact, ***Plaintiff readily admits that he was a minister***:

"[M]y time at Holy Family … helped me mature and grow *as a minister*."

As such, this Motion and the corresponding use of judicial resources was wholly unnecessary, only required because Plaintiff omitted from his Complaint any facts indicating the functions he performed during his employment. Plaintiff has subsequently refused to voluntarily dismiss his lawsuit despite being presented controlling authority directly on point, along with being reminded of videos he posted on the Parish's YouTube channel in which he was interpreting and teaching scriptures in the name of the Parish. Now, this Court should grant Defendants summary judgment on the issue of the ministerial exception, thereby stopping the "very process of inquiry" into Defendants' handling of one its unequivocal and self-admitted ministers, which is prohibited under the First Amendment.

## STATEMENT OF UNDISPUTED FACTS

### Plaintiff's Employment Overview

Plaintiff began his employment with the Parish in 1997 as its Director of Worship. [SOF, ¶6]. In or about 1999, Plaintiff added the title Director of Music. [SOF, ¶7]. Thereafter, Plaintiff concurrently held those two titles for the duration of his employment until his termination on July 27, 2014. [SOF, ¶8].

### Plaintiff's Education and Experience

At the time Plaintiff applied for employment with the Parish, he had a Diploma in Church Music from St. Francis Xavier University, a Masters of Divinity from Catholic Theological Union ("CTU"), and was both a candidate for a Master of Arts in Word and Worship and training to be a Liturgical Consultant at CTU. [SOF, ¶9]. As part of his coursework at CTU, Plaintiff took courses in, among other things, "Old Testament Introduction," "New Testament Introduction," "Introduction to Theology," "Language of Prayer," "Psalms," "Introduction to Pastoral Care and Counseling," "Introduction to Liturgical Preaching," "Theology of Church and Ministry," "Ministry Practicum II: Worship," "Spiritual Direction," "Bible Study/Liturgical

Preaching," "Music in Ritual," "Jeremiah and Prophetic Prayer," "Legal Aspects of the Sacraments," "Paul: Philippians, Philemon, Thessalonians," "Theology of Preaching and Presiding," "Liturgical Foundations of Spirituality," "Theology of the Eucharist," "Liturgical Catechesis," and "Worship and Pastoral Care." [SOF, ¶10].

He also had previously been the Director of Music at St. James Catholic Parish from 1992-1997, where he "formulate[d] the direction and overall liturgical program for approximately 25 parish musicians and members of church choirs," "[taught] the basic elements of liturgy and participation in the selection and adaptation of appropriate liturgical elements," "assist[ed] in the overall coordination of all liturgical celebrations," and was a "member of the parish liturgy and spiritual life commissions." [SOF, ¶11].

During his employment, Plaintiff also continued to participate in educational and formational coursework at CTU, taking classes towards earning a Doctor of Ministry degree. [SOF, ¶12]. The Parish paid $5,400 to CTU for some of Plaintiff's coursework between 2011 and 2014. [SOF, ¶13].

### Plaintiff's Job Responsibilities

At the time of his termination in July 2014, Plaintiff was the central non-ordained member of the Parish's ministerial staff, including holding duties primarily relating to the music and liturgies at Parish worship services. [SOF, ¶14]. Plaintiff, in collaboration with Father Terry Keehan, the Parish's pastor, led and oversaw meetings of the Liturgy Prep ministry, which prepared the liturgies for upcoming seasons, including reading and reflecting upon the Gospel. [SOF, ¶15]. Plaintiff, in collaboration with Father Keehan, also coordinated weekly liturgical plans. [SOF, ¶16]. Plaintiff also designed, arranged and played and/or led the music at Parish worship ceremonies. [SOF, ¶17]. In addition, Plaintiff played music at Parish funerals and

3

weddings, including requiring that he have final approval over all wedding music selected. [SOF, ¶18].

In 2014, Plaintiff and Parish Manager Rosemary Geisler created an updated job description for Plaintiff's concurrent titles of "Worship and Music Director," which memorialized the existing duties he had been and was performing [SOF, ¶19], including:

- "Promot[ing], embrac[ing], and execut[ing] all responsibilities and interactions with the parish mission"
- "Creat[ing] and implement[ing] weekly and seasonal liturgical experience[s] from sight and sound to prayerful moments"
- "Foster[ing] the development of ensemble groups, youth choir, children's choir, and youth and/or adult instrumental groups"
- "Work[ing] collaboratively as a member of the Pastoral Leadership Team to develop, support and implement the Pastor's Vision and the Vision and Mission of the Parish"
- "Identify[ing] and recruit[ing] potential liturgical ministers and volunteer workers"
- "Design[ing] and arrang[ing] the music program for Sundays and Feast Days" in collaboration with other leaders within the Parish
- "Developing tools necessary in a timely fashion to implement the theme and provide a liturgical plan to all involved to facilitate the maximum experience for the assembly"
- "Develop[ing] annual liturgical theme[s] as well as seasonal themes" in collaboration with other leaders within the Parish
- "Design[ing] and implement[ing] the Worship environment for Sundays and Feast Days."  [SOF, ¶20].

As the Director of Worship, Plaintiff also oversaw over twenty Parish ministries.  [SOF, ¶21].

Throughout Plaintiff's employment, the Parish held Plaintiff out as a minister, with a role distinct from other members of the Parish staff, including by identifying Plaintiff in Parish bulletins as the Director of Worship under the "pastoral and administrative staff" section directly beneath the Parish pastor (at the time of the below bulletin, Father Pat Brennan):



[SOF, ¶22]. Later, under the pastoral leadership of Father Keehan, the bulletin format changed but Plaintiff continued to play a prominent role, including having his own page in the bulletin. [SOF, ¶23]. Plaintiff also held himself out as a minister of the Parish to other Parish staff and to the Archdiocese, including acknowledging the ministerial nature of his position during the years of his employment through the goals and objectives he set for himself. [SOF, ¶24].

From 2011-2014, Plaintiff also gave nearly twenty lectures to Parish members relating to adult faith formation, including on the topics of "Sacrament of Baptism," "Holy Triduum / Paschal Mystery," and "The Beauty of Worship and Liturgy," the last of which was repeatedly advertised in Parish bulletins [SOF, ¶25]:



During that same period, Plaintiff also recorded nearly 40 video lectures, which were posted to the Parish's YouTube channel, in which he was interpreting and teaching scriptures in the name of the Parish [SOF, ¶26]:

5



**Plaintiff's Visa Application**

When the Parish sought to hire Plaintiff, he was not legally authorized to work in the United States. Accordingly, the Archdiocese applied for a religious worker visa for Plaintiff so that he could be employed at the Parish as a Director of Worship. [SOF, ¶27]. As part of the petition, the Archdiocese held Plaintiff out to the United States government as a key ministerial employee of the Parish, including performing religious functions. [SOF, ¶28]. The U.S. Immigration and Naturalization Service approved the petition and granted Plaintiff a religious worker visa status for his employment at the Parish. [SOF, ¶29].

Plaintiff's path from R-1 temporary religious worker to lawful permanent residency was possible because of the Archdiocese's sponsorship of his immigration petitions as a ministerial employee of the Parish. In 2001, Father Brennan asked the Archdiocese to apply for lawful permanent residency on Plaintiff's behalf, and in support thereof Father Brennan noted the important ministerial role that Plaintiff served in the Parish. [SOF, ¶30].

The Archdiocese also agreed to sponsor Plaintiff's application for permanent residency and based that immigration petition on the ministerial nature of Plaintiff's job at the Parish, requesting Special Immigrant Religious worker status, which required that the Archdiocese establish that Plaintiff was either an "ordained minister," a "member of a religious order," or a "religious professional." [SOF, ¶31]. In 2003, the U.S. Immigration and Naturalization Service

recognized and approved Plaintiff as a religious professional and granted him Special Immigrant Religious Worker status. [SOF, ¶32].

### Lay Ecclesial Ministry Program

In 2010, Plaintiff also applied for the Archdiocese's Lay Ecclesial Ministry program to begin the process of studying for ministry as a Pastoral Associate. In order to be eligible for this program, an applicant must have completed at least two years of ministerial work at an Archdiocese parish. [SOF, ¶33]. Plaintiff's application acknowledged the significant ministerial nature of his work at the Parish:

> "For fourteen years now I have been living my Baptismal Promises as the Director of Worship for the people of Holy Family Catholic Community. ***Over the years they have called me to not only prepare and lead various aspects of our Liturgical life, they have also invited me into their Spiritual lives and a retreat director and leader of prayer.*** I have spent time at their bed sides as they moved from this live [sic] into the loving embrace of Jesus Christ and the eternal life promised to them. … ***They have asked me to break open God's word in moment of preaching and teaching. … In essence I have served them as a pastoral associate for many years now… .***
> …
>
> ***My life in ministry has been exciting, challenging and truly varied.*** Ministry has called me to leave my home land, to journey to a strange and scary place, the inner city of Chicago, and now to live the 'mega church' experience, and at each stop along the way I have learned something new about myself and ***my understanding of ministry.***
> …
>
> It was an amazing feeling the first time I sat at the pipe organ to play for a Sunday worship service… .
> …
>
> ***Now my time at Holy Family I feel has helped me mature and grow as a minister.***

[SOF, ¶34 (emphasis added)]. In support of his application, Father Keehan wrote that Plaintiff "consistently shares his knowledge of scripture, liturgy, and church very generously with our community and beyond." [SOF, ¶35]. Jill Piccolino, Plaintiff's assistant, wrote in support of Plaintiff's application that Plaintiff was "very gifted in many areas of sharing liturgy, faith,

7

music, art and environment," that "his passion for the Gospel and having people to fully understand all facets of the Word of God is evident due to his sharing with conviction and authority," and that he had been "called to carry forward the mission of the Church." [SOF, ¶36].

### Plaintiff's Termination

On or about July 23, 2014, and following Plaintiff's public engagement to marry his male partner (now husband), Cardinal Francis George sent correspondence to Father Keehan instructing him to "resolve" that week the situation involving Plaintiff's employment in light of him publicly entering into a "non-sacramental marriage." [SOF, ¶37]. On July 27, 2014, after Plaintiff refused to resign, he was terminated. [SOF, ¶38].

On July 29, 2014, Father Keehan sent correspondence to Parish staff members announcing Plaintiff's termination, including stating that as "ministers of the Church, staff are expected to and agree to publicly uphold the teachings of the church." [SOF, ¶39]. Thereafter, Father Keehan published a statement in the Parish's weekly bulletin explaining that Plaintiff's termination was the result of him "publicly endors[ing] a position in conflict with church teachings," and again stating that as "ministers of the church, staff are expected to and agree to publicly uphold the teachings of the church." [SOF, ¶40].

On August 6, 2014, Cardinal George responded to correspondence he received regarding Plaintiff's termination by stating that Plaintiff's "decision to enter into a civil marriage or public union that cannot be recognized as sacramental by the Church makes it impossible for him to continue as a public minister of the Church," as the issue was a question of the "integrity of the ministries of the Church." [SOF, ¶41]. On October 22, 2014, Cardinal George also published a statement in the Parish's weekly bulletin stating that Plaintiff was terminated because as a "minister" he participated "in a form of union that cannot be recognized as a sacrament by the Church," that "[p]ersonal lifestyle enters into the consideration of suitability for ministry," and

that "ministers in an official position represent to the world the Church's understanding of marriage. At issue here is the integrity of the Church's public ministries." [SOF, ¶42].

## Plaintiff's Tax Returns

Following his termination, Plaintiff, on his 2014 tax returns, paid self-employment tax, holding himself out as a minister [SOF, ¶43]:



## **ARGUMENT**[1]

Under the First Amendment to the Constitution, the government cannot interfere with the decision of a religious organization to terminate one of its ministers. "Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of

---

[1] While the ministerial exception is an affirmative defense, summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489-490 (7th Cir. 2007).

the church, depriving the church of control over the selection of those who will personify its beliefs." *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC et al.,* 132 S.Ct. 694, 706 (2012); see also *Herzog v. St. Peter Lutheran Church*, 884 F.Supp.2d 668 (N.D. Ill. 2012) ("The ministerial exception, grounded in the Free Exercise and Establishment Clauses of the First Amendment, precludes claims of employment discrimination against a religious institution brought by its ministers.")[2] The purpose of the ministerial exception is to prevent a court from intruding into a "religious thicket." *Serbian Eastern Orthodox Diocese for United States and Canada v. Milivojevich*, 426 U.S. 696, 719 (1976)). This is because "the very process of inquiry" violates the First Amendment. *N.L.R.B. v. Catholic Bishop of Chicago*, 440 U.S. 490, 502 (1979).

Importantly, the ministerial exception is not dependent upon ordination, but upon the function of the position. *Rayburn v. General Conference of Seventh-Day Adventists*, 772 F.2d 1164, 1168 (4th Cir. 1985). Non-ordained employees are ministerial employees when they are responsible for conveying the Church's message, *Alicea-Hernandez*, 320 F.3d at 704, teaching the faith, *Hosanna-Tabor* 132 S.Ct. at 708, and carrying out the Church's mission. *Id.*; *Rayburn*, 772 F.2d at 1169; *Young*, 421 F.3d at 186.

In *Tomic*, a music director of a Catholic diocese filed an age discrimination suit against St. Mary's Cathedral following his termination. The Seventh Circuit affirmed dismissal of the

---

[2] See also *Alicea-Hernandez v. Catholic Bishop of Chicago*, 320 F.3d 698 (7th Cir. 2003) (Archdiocese of Chicago Hispanic communications manager could not bring Title VII national origin claim); *Young v. Northern Illinois Conference of United Methodist Church*, 421 F.3d 184 (7th Cir. 1994) (Free Exercise Clause of First Amendment precluded jurisdiction over Title VII action brought by African-American woman who had served as probationary minister for church, where she alleged that church engaged in race and sex discrimination); *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036 (7th Cir. 2006) (music director's ADEA claim barred by ministerial exception) (rev'd on other grounds).

music director's claim finding that the music director's position fell within the ministerial exception to the Age Discrimination in Employment Act. 442 F.3d 1040-41.[3]

Here, Plaintiff not only held the exact same position of music director as in *Tomic*, but was also the Director of Worship -- a position that, by its very terms, can be nothing other than religious. Indeed, applying the considerations relied upon by the Supreme Court in *Hosanna-Tabor*, 132 S.Ct. 707-708, Plaintiff's dual positions were clearly ministerial, including that: (1) the Parish held Plaintiff out as a minister; (2) Plaintiff received a significant amount of religious training for the position; (3) Plaintiff held himself out as a minister of the Parish; and (4) Plaintiff's duties reflected a role in conveying the Parish's message, teaching the faith, and carrying out its mission.

**A.    The Parish Held Plaintiff Out As A Minister**

Throughout his employment, the Parish held Plaintiff out as a minister, identifying him as a key member of the Pastoral staff, including listing him directly below the Parish pastor in Church bulletins [SOF, ¶22], and later giving him his own page in the bulletin. [SOF, ¶23]. The Parish relied on Plaintiff to convey the Parish's message and to teach the faith to its parishioners, through both song and liturgy. Plaintiff presented numerous speaking engagements at the Parish relating to adult faith formation, which the Parish prominently advertised in its bulletins [SOF, ¶25], and he also recorded nearly 40 videos that were posted to the Parish's YouTube channel, in which he was interpreting scriptures in the name of the Parish. [SOF, ¶26].

---

[3]     See also *EEOC v. The Roman Catholic Archdiocese of Raleigh*, 213 F.3d 795, 802 (4th Cir. 2000) ("music is an integral part of Catholic worship and belief . . . [and] . . . is a vital means of expressing and celebrating those beliefs which a religious community holds most sacred."); *Starkman v. Evans*, 198 F.3d 173 (5th Cir. 1999) (choir director's ADA claim dismissed); *Fassl v. Our Lady of Perpetual Help Roman Catholic Church*, No. 05-CV-0404, 2005 WL 2455253 (E.D. Pa. Oct. 5, 2005) (Director of Music precluded from bringing FMLA suit); *Ross v. Metropolitan Church of God*, 471 F.Supp.2d 1306 (N.D. Ga. 2007) (Director of Worship Arts (music director) barred from bringing section 1981 claim).

11

The Parish also publicly held out Plaintiff as a ministerial employee to the United States government, as evidenced by the religious worker visa that the Archdiocese applied for and obtained on his behalf, in which they represented that he was a key ministerial employee of the Parish. [SOF, ¶¶27-29]. The Archdiocese also agreed to sponsor Plaintiff for lawful permanent residency and based its immigration petition on the ministerial nature of Plaintiff's positions at the Parish. [SOF, ¶¶30-32].

**B.  Plaintiff Received A Significant Amount Of Religious Training.**

The ministerial nature of Plaintiff's employment is also evidenced by the significant amount of religious training he received. At the time he was hired, Plaintiff held a Diploma in Church Music from St. Francis Xavier University, a Masters of Divinity from Catholic Theological Union ("CTU"), and was both a candidate for a Master of Arts in Word and Worship and training to be a Liturgical Consultant at CTU. [SOF, ¶9]. He also had previously been the Director of Music at St. James Catholic Parish from 1992-1997, where he "formulate[d] the direction and overall liturgical program for approximately 25 parish musicians and members of church choirs," "[taught] the basic elements of liturgy and participation in the selection and adaptation of appropriate liturgical elements," "assist[ed] in the overall coordination of all liturgical celebrations," and was a "member of the parish liturgy and spiritual life commissions." [SOF, ¶11]. During his employment, Plaintiff also continued to participate in education and formational coursework at CTU, taking classes towards earning a Doctor of Ministry degree (which the Parish paid for, in part). [SOF, ¶¶12-13].

**C.  Plaintiff Held Himself Out As A Minister.**

Throughout his employment, Plaintiff also acknowledged the ministerial nature of his positions, including through the goals and objectives he set for himself as an employee. [SOF, ¶24]. Plaintiff also applied for the Archdiocese's Lay Ecclesial Ministry program to begin the

process of studying for ministry as a Pastoral Associate. [SOF, ¶33]. In order to be eligible for this program, an applicant must have completed at least two years of ministerial work at an Archdiocesan parish. [*Id.*] In his application, Plaintiff correctly identified his work at Holy Family as ministerial, including that at the Parish he had to "prepare and lead various aspects of Liturgical life," participated in parishioner's "spiritual lives," and his time at the Parish "helped [him] … grow as a minister." [SOF, ¶34].

Plaintiff also held himself out to the United States government as a ministerial employee of the Parish by accepting the benefits and responsibilities of being legally authorized to work in the United States. As discussed above, Plaintiff's ability to legally live and work in the United States from 1997-2005 was based on his immigration status as a religious worker for the Parish. He also achieved lawful permanent residency status through the sponsorship of the Parish and the Archdiocese, again based on his status as a religious professional. [SOF, ¶¶27-32]. He further held himself out as a minister to the government on his tax returns, in which he paid self-employment tax, claiming that he was a minister rather than as an employee of the Parish, which could have subjected him to withholdings. [SOF, ¶43].

**D.  Plaintiff's Duties Reflected The Ministerial Nature Of His Work.**

Last, Plaintiff's job duties in his dual roles of Director of Worship and Director of Music reflected the ministerial nature of his role. Plaintiff was the central non-ordained member of the Parish's ministerial staff, and his duties included not only those related to the music in the Parish's worship services, but also to the preparation and planning of the entire liturgies themselves. [SOF, ¶¶14-17]. The job description Plaintiff collaboratively prepared in 2014 listed his numerous responsibilities at the Parish, all of which involved conveying the Church's message, teaching the faith, and carrying out the Church's mission. [SOF, ¶¶19-20]. Indeed, Plaintiff, in his application for the Archdiocese's Lay Ecclesial Ministry program, described his

13

work as follows: "In essence I have served [the Parish] as a pastoral associate for many years now." [SOF, ¶34].

## CONCLUSION

Defendants are entitled to their fundamental constitutional right to religious freedom under both religion clauses of the First Amendment. There can be no legitimate dispute that Plaintiff's dual positions were ministerial. In fact he readily admitted the same. There also can be no legitimate dispute that the unequivocal and controlling caselaw bars his putative employment claims. For those reasons, it is especially important that the Court grant this Motion and stop this "impermissible inquiry" in its tracks. *Milivojevich*, 426 U.S. at 723.

WHEREFORE, Defendants Holy Family Parish and the Archdiocese of Chicago respectfully request that this Court grant Defendants' summary judgment, finding that the ministerial exception bars Plaintiff's claims, award Defendants their costs, and provide such other and further relief as this Court deems just.

Date: November 8, 2016

Respectfully submitted,
Holy Family Parish and the Archdiocese of Chicago,

By: __/s/ Alexander D. Marks__
One of its Attorneys

James C. Geoly
Alexander D. Marks
Burke, Warren, MacKay & Serritella, P.C.
330 North Wabash Avenue, 21st Floor
Chicago, Illinois 60611
Telephone: (312) 840-7000
Facsimile: (312) 840-7900
2328984

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that on November 8, 2016, a true and correct copy of Defendants' Memorandum of Law in Support of Motion for Summary Judgment was filed electronically using the Court's Electronic Case Filing System. A Notice of Electronic Filing will be sent by electronic mail to Plaintiff's counsel of record by operation of the Court's Electronic Filing System.

By: /s/ Alexander D. Marks