IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JOHN COLIN COLLETTE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:16-cv-2912 |
| ) | |
| THE ARCHDIOCESE OF CHICAGO, ) | Judge Charles P. Kocoras |
| And ) | |
| HOLY FAMILY CATHOLIC PARISH, ) | |
| ) | |
| Defendants. ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

NOW COMES, the Plaintiff, JOHN COLIN COLLETTE, by and through his attorneys, LAVELLE LAW, LTD., and for his Memorandum of Law in Support of his Response to Defendants' Motion for Summary Judgment, states as follows:

**INTRODUCTION**

At the time of his termination, Plaintiff John Colin Collette ("Mr. Collette" or "Plaintiff") was employed by Defendant Holy Family Catholic Parish ("Holy Family") for over 17 years. [Defendants' SOF, 6, 38]. During that time, Plaintiff was "out" as a gay man since the time he was hired [Exhibit 1, Affidavit of John Colin Collette]. Present at many of the Parish's functions and events was Plaintiff's partner, Will Nifong ("Mr. Nifong") [Exhibit 1]. Nifong, now Plaintiff's husband, attended Holy Family Functions as Plaintiff's partner, and sang in the Holy Family Choir on occasion [Exhibit 1]. In July 2014, Mr. Collette was terminated by Holy Family's pastor, Fr. Terence Keehan, ("Fr. Keehan") after Mr. Collette announced that he and Nifong had become

1

engaged to be married [Defendants' SOF, 37-38]. Mr. Collette brought the instant case on the basis of violations of sex discrimination pursuant to Title VII as well as for violations of state and local statutes barring discrimination on the basis of sex, sexual orientation, and marital status.

For its part, Holy Family and The Archdiocese of Chicago (hereinafter, collectively "Defendants") allege that the Ministerial Exception is a complete affirmative defense to Mr. Collette's discriminatory termination based on his sex, sexual orientation, and marital status because, they allege, Mr. Collette is a "minister" as defined in *Hosanna Tabor Evangelical Lutheran Church & School v. EEOC*, 565 U.S. 171 n.4, 132 S. Ct. 694, 709 (2012). Defendants claim that in his role at the church, Mr. Collette was a minister and, therefore, can be terminated for any reason, even a discriminatory one. Mr. Collette wholly denies that he was a minister in any capacity at Holy Family, maintaining that his role at Holy Family was to support Holy Family's "lay-empowerment" program of turning over the creation of the liturgy plan and music selections for Holy Family services to committees of volunteer parishioners, who set the theme of the season and individual masses, chose prayers and programs, selected music, and devised the flow of the liturgy for Holy Family Mass and other services. [Exhibit 1; Exhibit 2, Affidavit of Lisa Mersereau.] While typical music directors and directors of worship at Catholic parishes choose music and design the liturgy each week, such was not the case at Holy Family [Exhibit 2; Exhibit 3, Affidavit of Jill Piccolino].

Defendants have, for their part, attempted to color Mr. Collette as a minister with a penumbra of facts and circumstances that, they allege, fit Mr. Collette squarely within the title of minister. However, Defendants have declined to refer to Mr. Collette as a minister in several key documents. Mr. Collette's own Form I-360 to the United States Bureau of Citizenship &

Immigration Services, prepared by attorneys hired by Defendants, shows that when Defendants were faced with a choice of applying Mr. Collette as a "minister" or "religious professional," Defendants chose to define Mr. Collette's role as "religious professional," **and did not define Mr. Collette's role as "minister"** [Exhibit 4, Form I-360 for John Colin Collette].

Mr. Collette's role within Holy Family was not one of a minister. Accordingly, this Honorable Court must deny Defendants' Motion for Summary Judgment as to the ministerial exception.

## STATEMENT OF UNDISPUTED FACTS

When Mr. Collette began his employment at Holy Family, he did so as an openly gay man [Exhibit 1]. He held the title of Director of Worship and eventually assumed the title Director of Music as well. Mr. Collette was terminated on July 27, 2014 [Defendants' SOF, 38]. At all times relevant to these proceedings, there existed at Holy Family a Liturgy Planning and Preparation Committee and a Music Selection Committee, both of which Mr. Collette was a part [Exhibit 1]. During Mr. Collette's employment, the Liturgy Planning and Preparation Committee had twenty-six (26) members, most of which were lay volunteers, not employed by the Church [SOF, 2-3]. In July 2014, Mr. Collette took a vacation to Rome, Italy, where he became engaged to marry his longtime partner, Nifong [SOF, 4]. Mr. Collette announced the news via Facebook [SOF, 4]. Defendants learned of Mr. Collette's engagement via a post on the website Facebook.com [Exhibit 5, Keehan Deposition, 76:23-78:19]. Fr. Keehan asked for Mr. Collette's termination, and Mr. Collette refused [Defendants' SOF, 38]. Fr. Keehan then terminated Mr. Collette [Defendants' SOF, 38]. During the meetings regarding Mr. Collette's engagement and employment, Fr. Keehan showed Mr. Collette an email from then-Archbishop Francis Cardinal George ("Cardinal George")

dated July 23, 2014, which stated "Father Keehan: The need to resolve this issue is evident. Keeping an objectively immoral situation sponsored by the parish will continue to divide the Church. Especially at this time, clarity is needed. The clarity comes from the Church's moral teaching. Let me know *this week* when you plan to resolve this. Thanks, Francis Cardinal George, O.M.I." [Exhibit 6, HFP0001; Exhibit 5, 76:23-78:19]. On October 22, 2014, Holy Family published in its weekly church bulletin a statement by Cardinal George stating that Mr. Collette had been terminated due to his "participation in a form of union that cannot be recognized as a sacrament by the Church." [Exhibit 7, Holy Family Church Bulletin dated October 22, 2014]. At no time throughout this proceeding have Defendants identified any other reason for Mr. Collette's termination other than his intent to marry Mr. Nifong.

As for Mr. Collette's job responsibilities – for which Defendants devote a significant amount of argument – Defendants produced not just one job description for Mr. Collette, but rather, fifteen (15) different job descriptions describing Mr. Collette's job duties. [Exhibit Set 8, Job Descriptions]. The job description cited by Defendants as Mr. Collette's official job description is dated July 16, 2014 – a mere eight (8) days prior to Mr. Collette's termination [Exhibit Set 8, page 1-2].

## **STANDARD OF REVIEW**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists when, based on the evidence, a reasonable jury could find in favor of the non-moving party." *Herzog v. St. Peter Lutheran Church*, 884 F. Supp. 2d 668, 672 (N.D. Ill. 2012) (citing *Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653,

4

656 (7th Cir. 2010)). "In considering a motion for summary judgment, a court construes all facts and draws all reasonable inferences in favor of the non-moving party." *Id*. (citing *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2010).

## **ARGUMENT**

There remain significant issues of material fact in dispute regarding whether or not Plaintiff's role as Director of Worship and Director of Music at Holy Family were ministerial roles as defined by *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 n.4, 132 S. Ct. 694, 709 (2012). While *Hosanna-Tabor* provides broad deference to religious organizations to choose their own ministers, the ruling is careful to note that there is no strict formula for what constitutes a minister. "We are reluctant, however, to adopt a rigid formula for deciding when an employee qualifies as a minister." *Id*. at 190.

The four-part test that is provided in *Hosanna-Tabor*, however, calls for the Court to consider four elements of a test that determine, on a case-by-case basis, whether an employee was or was not a minister. *Hosanna-Tabor*, 132 S. Ct. at 708 n.4 (2012). They are (1) the formal title given to the employee by the Church, (2) the substance reflected in that title, (3) his/her own use of that title, and (4) the important religious functions he/she performed at the church." *Id*. at 192. To consider whether a person is or isn't a minister under the exception, the Court must take into account "all the circumstances of … employment." *Id*. at 190. In Mr. Collette's case, all the circumstances of his employment when viewed in aggregate show that Mr. Collette was not a minister, but rather, a highly educated lay person employed by Holy Family to facilitate its mission of lay empowerment [Exhibit 16, Holy Family's Mission and History].

1. **Mr. Collette's Title was a Lay Person Title**

When the *Hosanna-Tabor* court considered its plaintiff, a teacher at an Evangelical Lutheran Church, to be a minister, it took into account the fact that her title was that of a "called teacher." *Id*. at 192. The process of becoming "called" included a "formal commissioning process" that required the teacher to obtain the endorsement of the local Synod district, pass an oral examination by a faculty committee, and then be called by the congregation. The title of "called teacher" denotes someone who has satisfied all these elements. *Id*.

In the present case, Plaintiff held no title of commissioning or being called [Exhibit 1]. He was not the "Minister of Worship," nor the "Minister of Music," but rather, a director [Exhibit 1]. Holy Family employs multiple directors, overseeing various functions of the church, including a Director of Operations and a Director of Marketing [Exhibit 9, Various Holy Family Church Bulletins]. Moreover, nothing of Plaintiff's hire required him to complete any sort of commissioning process by which he became called by Holy Family or the Archdiocese of Chicago [Exhibit 1]. Plaintiff's process of becoming the Director of Worship and Director of Music was to apply for his job, be interviewed by Holy Family's pastor, and be hired. [Exhibit 1]. The job was not the variety that required him to be called to the vocation "by God through a congregation" as the Plaintiff in *Hosanna-Tabor*. *Id*. at 177.

In fact, Plaintiff attended the Archdiocese's Lay Ecclesial Ministry Program in hopes of obtaining a Pastoral Associate Certification and Call to Ministry [Exhibit 1]. This program did not require Plaintiff to have completed any ministry work, as Defendants' allege [Exhibit 1; Exhibit 18, Office of Lay Ecclesial Ministry Criteria for Eligibility]. Rather, it required such ministry work to be completed before a candidate could receive a Pastoral Associate Certification and Call to Ministry [Exhibits 1, 18]. Mr. Collette never completed the Lay Ecclesial Ministry Program, and

therefore was never eligible to receive the Pastoral Associate Certification or be Called to Ministry [Exhibit 1]. Accordingly, he was not "called" like the *Hosanna-Tabor* and *Herzog* plaintiffs.

The differences between Mr. Collette's title and the title of the *Hosanna-Tabor* plaintiff's title are further analyzed by this Court's ruling in *Herzog v. St. Peter Lutheran Church*, 884 F.Supp.2d 668, 673 (2012). In *Herzog*, the plaintiff also had been "called" to her vocation of teaching and "commissioned" by the congregation, as was the *Hosanna-Tabor* plaintiff. *Id*. at 670. No such commissioning is present in the instant case, and the title of Mr. Collette's employ reflected no such commissioning [Exhibit 1].

While it is true that Mr. Collette referred to himself as a "minister" in various contexts related to Church life, he was using Holy Family's preferred terminology, and there was no dearth of individuals using the term "minister" at Holy Family [Exhibit 9]. Holy Family considers dozens, if not hundreds of parishioners to be "ministers" of God's word [Exhibit 9]. Ministers are as young as 17 years old [Exhibit 9]. More than thirty (30) ministers are named in the "leadership structure" of Holy Family in the bulletin each Sunday, in addition to the priests and clergy who work at Holy Family [Exhibit 9]. The church appoints "liturgical ministers" to oversee seventeen (17) different committees, including a sewing committee and a projection and sound committee [Exhibit 9]. In addition, Holy Family has ministers who are juniors and seniors in high school, sign language leaders, and wedding ministers [Exhibit 9]. It names people "hospitality ministers" for providing snacks after Mass at the Church [Exhibit 9]. Holy Family also has ten (10) Table & Light ministers and eighteen (18) Eucharistic ministers, twelve (12) of whom are teens, and Ministers of Care to the Sick [Exhibit 9]. The Church advertises in its bulletin that parishioners can become members of the Church's "ministry" by cooking their favorite meals for Fr. Keehan or

7

by volunteering in the Church gift shop [Exhibit 9].

None of the "ministers" listed herein who are children, teens, gift shop volunteers or potluck participants are true "ministers" under the framework set forth in *Hosanna-Tabor*, so it is a facile analysis at best to claim that the use of the term "minister" makes Mr. Collette a minister under the *Hosanna-Tabor* standard. Mr. Collette's title did not reflect a calling and commissioning [Exhibit 1]. Moreover, Holy Family's mission of empowering its laity encouraged lay people such as Mr. Collette to participate in the Church in ways not commonly found at other Catholic Churches [Exhibits 2; 16]. Accordingly, Mr. Collette's title does not denote a "ministerial" role at Holy Family under the *Hosanna-Tabor* standard.

*Hosanna-Tabor* provides a precedential definition of minister, the term is not used nearly so sparingly at Holy Family, where dozens, if not hundreds, of people are referred to as "ministers" The terms "minister" and "ministry" are used so frequently in Holy Family's parlance that the Court should disregard Defendants' claims that Plaintiff has already "admitted" he was a minister due to his previous uses of the word to describe himself in a non-legal context.

### 2. Plaintiff's Theological Training Was Not a Requirement of His Employment

It is undisputed that Plaintiff had theological training [Exhibit 10, Collette Resume]. But such thorough theological training was not a requirement of the positions of Director of Worship and Director of Music that Plaintiff held [Exhibit 1; Exhibit 8]. Unlike the plaintiffs in *Hosanna-Tabor* and *Herzog*, at no time was Plaintiff required to complete specific theological training for the purposes of holding his position [Exhibit 1]. The job descriptions provided by Defendants provide that the Director of Worship and Director of Music must have the following experience: "experienced background in liturgical ministry. Background in music is needed;" "a

strong understanding of the liturgical norms and traditions of the church;" and "commitment to the principles of Vatican II." [Exhibit 8]. But there was no requirement of any specific courses, specific recommendation, or specific prerequisites that Plaintiff needed to qualify for his duties. [Exhibit 1; Exhibit 8]. Conversely, the plaintiff in *Herzog* was required to complete specific training and commissioning. *Herzog* at 673. The plaintiff in *Hosanna-Tabor* was required to complete a "colloquy" program at a Lutheran college or university, take eight (8) courses of theological study, obtain the endorsement of their local synod district and complete an oral examination. *Hosanna-Tabor* at 177. There was simply no such comparable process for Mr. Collette to take on these roles at Holy Family [Exhibit 1]. To be sure, Mr. Collette was hired with the academic accomplishments listed on his resume [Exhibit 10]. The only academic requirement of his position, as described in the job posting provided by Defendants, was that he have a "graduate degree in Liturgy/Theology or equivalent." [Exhibit 8]. And, as a lifelong student, Mr. Collette continued his religious studies in hoping to become a pastoral associate at Holy Family [Exhibit 1]. But he did not complete that process, and it was simply not a requirement of the positions Mr. Collette held [Exhibit 1]. Mr. Collette took training outside the church, but the training was in furtherance of goals he had to become a pastoral associate, not a requirement of his job [Exhibit 1]. Accordingly, the religious education that Mr. Collette completed after his hiring must be disregarded because it was not a requirement of his positions within Holy Family.

    **3.    Plaintiff held himself out as laity, not a minister.**

Mr. Collette possessed no power to choose the music or design the liturgy independent of Fr. Keehan at Holy Family [Exhibits 1-3; Exhibit 12, Affidavit of Sue Brach; Exhibit 13, Affidavit of Denise Logan]. At each opportunity for such decision making to occur, Mr. Collette required final

approval from Fr. Keehan [Exhibits 1-3, 12-13]. Unlike the plaintiffs in *Herzog* and *Hosanna-Tabor*, Mr. Collette never accepted a call to religious service [Exhibit 1]. The *Hosanna-Tabor* plaintiff was "held out" by her employer, a parochial school, as a minister, "with a role distinct from that of most of its members." *Id*. at 191. The *Hosanna-Tabor* plaintiff received "diploma of vocation" that granted her the title "Minister of Religion, Commissioned." *Id*. Her "skills of ministry" and "ministerial responsibilities" were periodically reviewed by the congregation. *Id*. The Court found that for these reasons, the church and school "held out" the *Hosanna-Tabor* plaintiff as a minister. *Id*.

Defendants have cited Plaintiff's pages in the bulletin, videos on YouTube.com, and teaching sessions at Holy Family as indicating that Mr. Collette "held himself out" as a minister at Holy Family. While these actions may be reserved only for ministers at other parishes in the Archdiocese of Chicago, at Holy Family church bulletin contributions, YouTube.com videos, and teaching sessions are also performed by the laity [Exhibit 14, Holy Family YouTube.com page; Exhibit 1; Exhibit 5, 46:1-21]. In the instance cited by Defendants in which Mr. Collette presented a seminar entitled "The Beauty of Worship and Liturgy," another lecture in the same Adult Faith Series was given by Rabbi Taron Tachman, a Jewish Rabbi of the nearby Beth Tikvah Congregation in Hoffman Estates, Illinois [Exhibit 19, Upcoming Events in Adult Faith; Exhibit 20, Beth Tikvah Congregation Clergy Listing].

While Mr. Collette's videos have been removed from the Holy Family YouTube.com page, the videos of literally dozens of other lay people – many of them not even Holy Family employees – remain posted on the Holy Family YouTube.com page. [Exhibit 14]. The videos, called "Reflections on Readings," are frequently recorded by Holy Family parishioners with little to no

religious training [Exhibit 5, 46:1-21]. These videos, again, were aimed at furthering the Holy Family mission of empowering the laity [Exhibit 1]. Contributions to the Holy Family church bulletins were also common by many staff members, not just Mr. Collette. [Exhibit 1]. Mr. Collette did not, as Defendants allege, hold himself out as a minister on his 2014 federal income tax returns by paying self-employment tax [Exhibit 1]. Mr. Collette's floral business, Surroundings by Colin, was a sole proprietorship at the time, and therefore required he pay self-employment tax [Exhibit 1]. (The business has since been incorporated [Exhibit 1; Exhibit 15, Corporation File Detail Report].) In addition, his immigration application, supported by Defendants, reflected that he was a "religious worker" at the exclusion of choosing the title "minister" [Exhibit 4, Form I-360 for John Colin Collette]. Because Mr. Collette did not hold himself out as a minister, the Court must not grant summary judgment in favor of Defendants.

**4. Plaintiff Did Not Hold Ministerial Duties, but Instead Assisted with Holy Family's Lay Empowerment Mission.**

While Mr. Collette was a Director of Worship and Director of Music at Holy Family, those roles were not typical of other directors of worship and directors of music at other Catholic parishes in the Archdiocese of Chicago [Exhibit 2]. The *Hosanna-Tabor* plaintiff's job duties "reflected a role in conveying the Church's message and carrying out its mission." *Hosanna-Tabor* at 192. Mr. Collette's job duties did not. He did not write the Liturgy Plans for Holy Family; they were drafted by Jill Piccolino, Assistant Director of Worship, and reviewed by all the directors at Holy Family, including Mr. Collette, through a collaborative process that was supervised and reviewed by Fr. Keehan [Exhibits 1-3; 12-13]. The *Hosanna-Tabor* plaintiff taught religion four days a week, led students in prayer three times a day, selected hymns, chose the liturgy, and

delivered short messages from the bible. *Id.* Mr. Collette did not have any comparable duties. He did not select the music for services, the music was instead selected by the Music Selection Committee -- of which Mr. Collette was a member – and approved by Fr. Terry. [Exhibit 1]. While Fr. Keehan steadfastly insisted that he received the Holy Family liturgy plans on Thursday or Friday of each week as a *fait accompli*, and never received them on Tuesday or prior to Tuesday, for the meeting of Holy Family's directors [Exhibit 5, 23:20-30:16]. Plaintiff's witness affidavits contradict Fr. Keehan's account, with multiple former employees attesting that they and Fr. Keehan received the Liturgy Plans each week no later than Tuesday at noon in advance of meetings regarding the Liturgy Plans each Tuesday at 12 p.m. and 1:30 p.m., allowing for a collaborative liturgy process that did not give any special weight to Mr. Collette's contributions [Exhibits 1-3; 12-13]. The initial draft of each Liturgy Plan was drafted and supplied by Ms. Piccolino on Monday or Tuesday of each week. [Exhibit 3]. It was then reviewed by Mr. Collette, Ms. Piccolino, and Fr. Keehan at a meeting each week at 12 p.m. on Tuesday [Exhibits 3; 12]. It was then reviewed by Fr. Terry and all the Holy Family directors at a meeting at 1 p.m. each Tuesday [Exhibits 1-3, 12-13]. Holy Family's collaborative process of creating the Liturgy Plans left the job in the hands of no one person, but instead in the hands of the lay members of the Liturgy Planning and Preparation Committee, the Holy Family directors (including Mr. Collette and, depending on the relevant time, seven to eight other directors), priests who presided over the Holy Family Masses, Ms. Piccolino, Ms. Brach, and Fr. Keehan, with Fr. Keehan possessing the *sole ability* to change or approve the liturgy plans [Exhibits 1-3; 12-13]. While Defendants portray Mr. Collette as the "central figure" in the Holy Family staff who lead the church in directing its liturgy plans and music selections, such assertion ignores the duly-supported fact that Holy Family empowered its

12

congregants and laity to be their own ministers, with Fr. Keehan the final arbiter on approving their decisions. [Exhibits 1-3; 12-13]. Mr. Collette does not contest that he had religious duties, but he contends that his religious duties at Holy Family were those that were also performed by the laity at Holy Family, and there existed no duty and obligation that Mr. Collette had that was not also performed by parishioners and congregants at Holy Family. [Exhibits 1; 3]. If Holy Family insists that someone who recorded YouTube.com videos, drafted Liturgy Plans, contributed to the church bulletin, and participated in seminars at Holy Family is a minister, then the title of minister applies to dozens, if not hundreds of people who attend and work at Holy Family. Accordingly, Mr. Collette cannot be deemed a minister under the *Hosanna-Tabor* standard. At the very least, there exists a genuine issue of material fact that prevents this Honorable Court from granting summary judgment in favor of Defendants.

**5. The Court Must Not Apply a Formula for Determining if Plaintiff was a Minister**

It should be noted that the *Hosanna-Tabor* court specifically noted that there could be no "rigid formula" to determine if a Plaintiff is a minister under the standards set forth in its ruling. *Id*. at 190. But with each Court ruling that has been published since *Hosanna*, Defendants have attempted to use the job description and job title of each case's plaintiff as a bright-line designation as "minister." The fact is that just as no case has the same facts, no two churches operate in the same fashion, no congregation is the same, and no employment role is the same. *Hosanna-Tabor*'s instruction is clear that no "rigid formula" should be applied to its test. *Id.* Therefore, it is not enough to say that because the plaintiff in Tomic v. Catholic Diocese of Peoria (442 F.3d 1036, 1037 (7th Cir. 2006)) played the organ and so did Mr. Collette, that Mr. Collette is therefore a minister under *Hosanna-Tabor*. In fact, the very opposite is true. There is no rigid formula, and the

13

Court must consider all the circumstances of employment to determine whether Mr. Collette was a minister. *Fratello v. Roman Catholic Archdiocese of N.Y.*, 175 F. Supp. 3d 152, 163 (S.D.N.Y. 2016). Accordingly, the Court must take into account the dynamic described by Lisa Mersereau, who explained that in working with fifteen (15) Catholic parishes, she had never seen a Catholic church in the Archdiocese of Chicago give more duties and deference to the lay members of its congregation. [Exhibit 2]. The facts are simple – Mr. Collette did not design the liturgy nor the liturgy plans at Holy Family; and he did not choose the music for the Masses as Holy Family [Exhibit 1]. These decisions were made by the laity that Holy Family empowered with these decisions [Exhibits 1-3; 12-13]. And Mr. Collette did not have the final say in any decisions made as to Music or Liturgy [Exhibits 1-3, 12-13]. Holy Family's pastor, Fr. Keehan, held this right alone, a fact supported by multiple affidavits from Holy Family's former employees. [Exhibits 1-3, 12-13].

Plaintiff does not deny that he is well educated in the subject of the Catholic faith. But his education and training alone did not designate him as a minister. And he does not dispute that he was conferred the title of Director of Worship and Director of Music by Holy Family. He used his title. However, the functions Mr. Collette performed at Holy Family were not typical of the functions of a music director at other Catholic parishes [Exhibit 2]. The functions Mr. Collette performed at Holy Family were to facilitate Holy Family's mission of lay-empowerment of its congregation [Exhibit 2].

## CONCLUSION

Plaintiff was not a minister under the analysis required by *Hosanna-Tabor*, and accordingly, the ministerial exception must not apply in the present case. Holy Family's parish

14

structure did not allow Plaintiff to assume the typical duties of a Director of Worship and Director of Music. While someone who held those positions in another Catholic parish may be considered a minister, Mr. Collette's duties at Holy Family did not rise to the level of "minister" pursuant to *Hosanna-Tabor*'s ruling. The Court must review these matters on a case by case basis, and in the present case, Plaintiff was not type of minister contemplated by the ministerial exception.

WHEREFORE, Plaintiff John Colin Collette respectfully requests that this Court deny Defendants summary judgement, finding that the ministerial exception does not apply as an affirmative defense in the instant case, proceed to conduct discovery on the remaining matters in dispute, and grant any other and further relief as this Court deems equitable and just.

Respectfully submitted,

**LAVELLE LAW LTD.**

/s/ Kristina B. Regal
Kerry M. Lavelle (Ill. Bar # 6201522)
Matthew J. Sheahin (Ill. Bar # 6243872)
Kristina B. Regal (Ill. Bar # 6300647)
LAVELLE LAW, LTD.
501 W. Colfax
Palatine, Illinois  60067
(847)705-7555
kmlavelle@lavellelaw.com
msheahin@lavellelaw.com
kregal@lavellelaw.com
**ATTORNEYS FOR PLAINTIFF**